November 3, 1977

## 77–62 MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

### Richard Helms' Eligibility Under 5 U.S.C. § 8314 To Receive an Annuity or Retired Pay

This memorandum opinion is to confirm our oral opinion that Richard Helms, former Director of the Central Intelligence Agency (CIA) and an ambassador, will not be barred by 5 U.S.C. § 8314 from receiving an annuity or retired pay on the basis of his Federal service by virtue of his plea of *nolo contendere* to two counts of violating 2 U.S.C. § 192 in connection with appearances before the Senate Foreign Relations Committee on February 7 and March 6, 1973.

Based on staff discussions and our reading of the relevant transcripts, our understanding of the circumstances surrounding Mr. Helms' testimony is as follows:

He appeared before the committee in open session on February 5, 1973, in connection with the committee's consideration of his nomination as Ambassador to Iran. He was then requested to appear in executive session on February 7 so that the committee could question him in three areas: recently published allegations that the CIA had provided training to local police forces; CIA involvement with the Watergate affair; and CIA relations with multinational corporations, particularly regarding the International Telephone & Telegraph Corporation (ITT) and the 1970 election that brought Salvador Allende to power in Chile.

At the February 7 hearing, Mr. Helms was asked questions relating, *inter alia*, to domestic activities of the CIA, the relationship of Watergate defendants to the CIA, the Agency's Domestic Contact Service, and the CIA's relationship to other Government agencies. However, the charge of a violation of 2 U.S.C. § 192 in connection wih the February 7 hearing stems from Mr. Helms' refusal to answer questions relating to his knowledge of the CIA's attempts in September and October of 1970 to foment a coup in Chile, his knowledge of the CIA's financing of groups working against Allende's accession to the Presidency of Chile, and his knowledge of the CIA's efforts to influence the

actions of certain U.S. multinational corporations to create economic pressures in order to decrease the likelihood of Allende's accession.

The March 6 hearing was held in large part for the benefit of the committee's Subcommittee on Multinational Corporations, which was studying the relationship of multinational corporations to the foreign policy of the United States, although Chairman Fulbright indicated that much of the questioning would be of interest to members of the full committee as well. Mr. Helms' testimony related primarily to CIA activities in connection with the 1970 Chilean election, including: contacts between CIA and ITT officials; the nature of U.S. policy in 1970 regarding the election; whether fomenting a coup or applying economic pressures through private companies would have been consistent with U.S. policy relating to Chile; whether the Forty Committee had authorized certain activities to influence the outcome of the election; and generally whether the CIA had taken measures to prevent Allende's election.[1] Mr. Helms is charged with failing accurately and fully to answer (and thereby refusing to answer) questions relating to his knowledge of these matters.

Section 8314(a) of Title 5, United States Code, provides that a Federal annuity or retired pay may not be paid to an individual (or his survivor or beneficiary) who:

> refused or refuses, or knowingly and willfully failed or fails, to appear, testify, or produce a book, paper, record, or other document, relating to his service as an employee, before a Federal grand jury, court of the United States, court-martial, or congressional committee, in a proceeding concerning—
>
>> (1) his past or present relationship with a foreign government; or
>>
>> (2) a matter involving or relating to an interference with or endangerment of, or involving or relating to a plan or attempt to interfere with or endanger, the national security or defense of the United States.

In our opinion, the ineligibility imposed by this section is inapplicable to Mr. Helms' refusal to testify at the 1973 hearings.

I

Although its language is a bit ambiguous, we believe that § 8314 is on its face inapplicable in the present situation. Neither committee hearing could reasonably be characterized as a proceeding concerning Mr. Helms' "past or present relationship with a foreign government." Fairly read, the quoted phrase seemingly refers to disloyal or subversive relationships with foreign governments, not contacts that may arise in the course of the individual's official duties. *See* Part II and III, *infra.* We are unaware of any suggestions that a purpose of either the Febru-

---

[1] There were also several questions relating to Cuba and certain other CIA operations, but the Chilean election was the major topic of discussion at the March 6 hearing.

ary 7 or the March 6 hearing was to examine Mr. Helms' loyalty to the United States or any subversive relationships he may have had with foreign governments.

The second type of proceeding mentioned in § 8314 is that concerning an "interference with or endangerment of . . . the national security or defense of the United States." Read broadly, the quoted phrase could conceivably be read to cover the present situation. The questioning of Mr. Helms did relate to the national security and defense of the United States in a general way; intelligence and other operations of the CIA inevitably pertain to national security and defense. Moreover, the primary focus of the questioning, especially during the March 6 hearing, concerned an important element of U.S. foreign policy, *i.e.*, the Nation's interest and involvement in the Chilean election, and the participation of ITT and other U.S. corporations in the formulation and implementation of that policy. In other contexts, the phrase "national security" has been interpreted to encompass ordinary foreign policy considerations as well as the national defense. *See, e.g.,* Executive Order 11652, § 1 (classification Executive order). Finally, the committee's overall concern with the effect of multinational corporations on U.S. foreign policy could be thought to relate to adverse effects on national security or defense in a broad sense, if such corporations were found to have an overall weakening effect on the Nation's position. Thus, it could be argued that the hearings related to a possible "interference with . . . the national security" to the extent that the committee sought to determine whether ITT unduly altered U.S. policy in Chile from what it might otherwise have been or whether the CIA ignored or transgressed and thereby "interfered" with U.S. policy regarding Chile.

However, we believe that this would be a strained reading of § 8314 in the present setting. When the term "interference" is read in conjunction with the word "endangerment," it would seem that § 8314(a)(2), like § 8314(a)(1), should be read to refer to activities of a disloyal or subversive nature, and ones that may have a relatively imminent and readily discernible adverse impact on officially established policy. Accordingly, those provisions effectively complement one another. The first refers to proceedings in which the individual's *own* loyalty is in question, and the second refers to actions or plans involving *other* people (and perhaps the individual as well) or of which the individual has knowledge.

Thus, subsection (a)(2) would not on its face appear to apply to the two hearings at which Mr. Helms testified, which involved an inquiry into the nature and implementation of U.S. foreign policy in a given instance and the influence of private persons in formulating the policy, without any apparent suggestion of disloyalty on the part of Mr. Helms or others or of possible attempts to subvert U.S. policy.

## II

This somewhat limited interpretation of 5 U.S.C. § 8314 is reinforced by reference to other sections of the entire subchapter of Title 5, of which § 8314 is a part. Under 5 U.S.C. § 8312, an individual is ineligible to receive a pension or annuity if he has been convicted of certain enumerated offenses. The listed offenses all pertain to espionage, sabotage, treason, subversion, or disloyalty.[2]

In addition, pension and retirement disability is also imposed if the individual is convicted of perjury in falsely denying the commission of any of the offenses just mentioned or in falsely testifying with respect to his service as a Government officer or employee in connection with a matter involving "an interference with or endangerment of, or involving or relating to a plan or attempt to interfere with or endanger, the national security or defense of the United States." 5 U.S.C. § 8312(b)(3).[3] The existence of these two provisions in the perjury subsection strongly suggests that false testimony regarding "interference" or "endangerment" involving others must also pertain to activities or plans that are tinged with disloyalty or subversion. This reading of the perjury provisions is entirely consistent with our interpretation of the comparable refusal-to-testify provisions in § 8314.

Finally, § 8313 imposes pension and annuity ineligibility if the individual is under indictment for any of the offenses named in § 8312, and, with knowledge of the indictment, remains outside of the United States for more than 1 year.

As can be seen, 5 U.S.C. §§ 8312–8314 reflect a comprehensive effort to deny a pension or annuity to a Federal official who commits acts or offenses that endanger the national security or hinder the Government's ability to learn about such acts or offenses committed by the individual or by others. In view of Congress' careful specification in § 8312 of only those criminal offenses that involve espionage, sabotage, treason, subversion, or disloyalty, we believe that the sanctions in § 8314 for refusals to testify must apply only where the proceedings involved relate to activities of a similar nature engaged in by the individual himself or by others. As mentioned above, neither of Mr. Helms' appearances involved an inquiry into such activities.

## III

Whatever remaining doubt there may be as to the proper scope of § 8314 is, in our view, dispelled by reference to the legislative history of the section. The predecessor to the present § 8314 was first enacted

---

[2] The offenses include gathering and transmitting defense information to injure the United States or to aid a foreign nation; sabotage; treason; advocating overthrow of the Government; activities affecting the morale, loyalty, or operation of the armed services;. service against the United States; violations of the Atomic Energy Act with intent to injure the United States or to aid a foreign nation; and communication of classified information. § 8314(b) (1)–(2).

[3] The quoted phrase is identical to that in § 8314(a)(2).

as § 2(a) of P.L. 83–769, 68 Stat. 1142, popularly known as the "Hiss Act." The principal purpose of the Act was to prevent Alger Hiss from receiving retirement benefits when he reached age 62. *Hiss* v. *Hampton*, 338 F. Supp. 1141, 1149–53 (D.D.C. 1972) (three-judge court). In 1954, Mr. Hiss was about to be released from confinement following his conviction for perjury in connection with a grand jury investigation of his possible violation of espionage and other laws arising from his alleged transmission of confidential State Department documents to a Communist agent. The documents involved were "of such a nature that even at the comparatively late day of their disclosure some could not for security reasons safely be made public . . . ." *Id.* at 1147, quoting *United States* v. *Hiss*, 185 F. 2d 822, 828 (2d Cir. 1950). There was widespread public outcry at the possibility that Mr. Hiss might receive an annuity and Congress responded by passing P.L. 83–769.[4] Thus, it is clear that the predecessor of the present § 8314 was part of an Act the primary purpose of which was to bar the payment of an annuity to a person convicted of perjury in connection with an inquiry into alleged activities of a distinctly disloyal nature. Our intepretation of the language of § 8314 is therefore consistent with Congress' original purpose.

However, Public Law 83–769, as enacted in 1954, swept more broadly than was necessary to accomplish this relatively limited purpose. The original Act also provided for the denial of annuities to persons who committed any other offense related to the performance of their official duties. This resulted in the denial of valuable benefits to persons convicted of relatively minor offenses, such as petty theft. *See, e.g.,* H.R. Rep. No. 541, 87th Cong., 1st Sess., 1 (1959); S. Rep. No. 862, 87th Cong., 1st Sess., 1–3. To correct this perceived injustice, Congress in 1961 greatly restricted the coverage of Public Law 83–769 to eliminate the additional ineligibility sanction imposed on those who had committed offenses that had no bearing on loyalty or national security. P.L. 87–299, 75 Stat. 646. *See, Hiss* v. *Hampton*, 338 F. Supp., at 1152. It was at that time that Congress limited the specific offenses that give rise to ineligibility under § 8312 to those involving espionage, sabotage, subversion, disloyalty, and the like, as discussed earlier in this memorandum. These changes were specifically designed to limit the application of the overall Act to situations within the original primary purpose of the Act, *i.e.,* to reach Alger Hiss and those in a comparable position. *Hiss* v. *Hampton, supra,* at 1151–53. *See, generally* S. Rep. No. 862, 87th Cong., 1st Sess., 1–3, 11 (1961); H.R. Rep. No. 541, 87th Cong., 1st Sess., 1–2 (1961); S. Rep. No. 1544, 86th Cong., 2d Sess., 1–2 (1960); S. Rep. No. 144, 86th Cong., 1st Sess., 2, 7 (1959); H.R. Rep. No. 258, 86th Cong., 1st Sess., 3 (1959); Hearings on H.R. 4601 and Related Bills

---

[4] Congress' purpose of denying an annuity to Mr. Hiss was ultimately thwarted. The court held in *Hiss* v. *Hampton* that the denial of an annuity was intended as a penalty and that the law was therefore unconstitutional *ex post facto* legislation as applied to Mr. Hiss.

before the House Committee on Post Office and Civil Service, 86th Cong., 1st Sess. 2 (1959); 105 Cong. Rec. 5831-33 (1959).

This clear expression of congressional intent, and the specific criminal offenses identified by Congress in narrowing the Act in order to be consistent with its original intent, lend strong support to our interpretation that § 8314 reaches only refusals to testify in proceedings relating to the employee's loyalty or immediate threats to the national security of a subversive nature. Indeed, the relevant committee reports describe the present § 8314(a) as prohibiting annuities or retired pay:

> to persons refusing, on grounds of self-incrimination, to testify or produce documents, in proceedings relating to loyalty, or with respect to their relations with foreign governments. *This continues present law, except as to offenses not involving loyalty.* S. Rep. No. 862, at 7; H.R. Rep. No. 541, at 5. [Emphasis added.] [5]

*See, also* H.R. Rep. No. 541, at 2-3; *Hiss v. Hampton, supra,* at 1153 (referring to the 1961 Act as restoring benefits to those who committed "non-treasonous" offenses); *Garrott v. United States,* 340 F. 2d 615, 620 (Ct. Cl. 1965) (referring to § 2 of the 1961 Act, which included the present § 8314, as covering "subversive acts and associations").

In our view, the legislative history clearly confirms that § 8314 is intended to apply only where the proceeding in which the individual refuses to testify concerns the individual's own loyalty or his knowledge of activities or plans that pose a serious threat to national security—and principally a breach of security, such as that involved in the *Hiss* case. As such, it is inapplicable in the present situation involving Mr. Helms.

Finally, it should be noted that § 8314 is penal in nature, *Hiss v. Hampton, supra,* at 1153, and penal statutes are traditionally construed narrowly. The Comptroller General applied this principle of narrow construction to the original Hiss Act, concluding that there is no reason why the Act should be interpreted to apply where it does not expressly do so. 41 Comp. Gen. 62, 65 (1961); 35 Comp. Gen. 302, 303 (1955). Thus, there is no reason in the present situation to extend § 8314 beyond its evident primary purpose in order to reach the present case.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[5] These committee reports provide some basis for arguing that § 8314 applies only where the refusal to testify is based on Fifth Amendment grounds, as was true with § 2(a) of the 1954 act. In view of our conclusion here, there is no need to address this issue.

257